```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3

 4   IN RE:  COUNTRYWIDE FINANCIAL   ) Master File No. 08-MD-1974
      CORPORATION LENDING PRACTICES  )
 5    LITIGATION                     )
                                     )
 6                                   )
                                     )
 7                                   ) December 15, 2008
                                     ) Louisville, Kentucky
 8

 9            *****************************************

10                   TRANSCRIPT OF STATUS CONFERENCE
                      BEFORE JOHN G. HEYBURN, II
11                   UNITED STATES DISTRICT JUDGE

12            *****************************************

13   APPEARANCES:

14   For Plaintiffs:       Guy A. Hanson
                           Bonnett, Fairbourn, Friedman& Balint, PC
15                         2901 North Central Ave., Suite 1000
                           Phoenix, AZ 85012
16
                           Ronald R. Parry
17                         Parry, Deering, Futscher & Sparks, PSC
                           411 Garrard Street
18                         P. O. Box 2618
                           Covington, KY 41012-2618
19
                           Gary E. Klein
20                         Roddy, Klein & Ryan
                           727 Atlantic Avenue
21                         Boston, MA 02111-2810

22
                         Dena Legg, CCR, RMR, CRR
23                       Official Court Reporter
                         221-A U.S. Courthouse
24                       Louisville, KY 40202
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

```
1    APPEARANCES (Continued):

2

     For Plaintiffs (via telephone):
3                            Robert M. Foote
                             Foote, Meyers, Mielke & Flowers, LLC
4                            28 North First Street, Suite 2
                             Geneva, IL 60134
5
     For Defendants:
6                            James W. McGarry
                             Goodwin Procter
7                            Exchange Place
                             53 State Street
8                            Boston, MA 02109

9                            Thomas M. Hefferon
                             Goodwin Procter
10                           901 New York Avenue NW
                             Washington, DC 20001
11
                             Byron E. Leet
12                           Wyatt, Tarrant & Combs, LLP
                             2500 PNC Plaza
13                           500 West Jefferson Street
                             Louisville, KY 40202
14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in court library at 2:05 p.m.)

2          THE COURT:  I don't know how much we really need to

3   take care of here.  We've got, basically, the class action

4   schedule set out.  Have you all started much yet or not?

5          MR. MCGARRY:  We have done some discovery.

6          THE COURT:  And how's that going to go?

7          MR. KLEIN:  We worked hard to try to narrow the

8   issues, and I think we made some incremental progress in that

9   area.

10     Plaintiffs took one 30(b)(6) deposition.  We've received

11  some documents just last week that we're starting to go

12  through.  And we can't evaluate yet whether we're going to have

13  disputes about what we've received and what we believe we need

14  yet to receive.  And we have narrowed our differences to some

15  extent on the balance of the open issues.

16     Having said that, I think there's still some significant

17  issues that are going to need to -- need work.  Probably the

18  biggest one is related to data discovery.

19     If you remember, this is a case of -- where we've alleged

20  adverse impact of certain lending practices which affect and

21  create a disparity in the rates for black and Hispanic

22  borrowers of Countrywide.

23          THE COURT:  Is it interest rates or is it fees and

24  other charges or both?

25          MR. KLEIN:  A combination.  I think that our position

1     would be that we -- we're going to find the disparities most

2     prominently in the annual percentage rate, which includes all

3     of the fees and charges.  It's a rate for the loan that

4     includes all of the fees and charges and cost of the loan as an

5     element of the loan costs.

6         We expect that for class certification we're going to need

7     to have data discovery in order to establish where our clients

8     fall in the range of possible disparities.  We believe that

9     we're going to need to run the types of regression and analysis

10    of the data that would be necessary for us to be able to show

11    that our plaintiffs are typical and that they have common

12    claims with everybody else in the class, meaning that they have

13    the same types of disparities at the same level as other black

14    and Hispanic borrows.

15           THE COURT:  Of course, that's going to be pretty

16    difficult to do because -- isn't it, because some of -- I mean,

17    let's assume there is a disparity of some kind or another.  I

18    mean, I guess you're trying to get the data on all of the

19    loan -- I mean, do you have to go to all the loans that were

20    made everywhere and compare the loans to minorities, African-

21    Americans, Hispanics, is that -- with all others, is that what

22    you're doing or how --

23           MR. KLEIN:  That would be -- that would be the plan.

24    The issue, of course, would be to come up with the appropriate

25    set of regressions to take out factors that represent

1    legitimate business justifications for different rates.  So

2    the --

3              THE COURT:  Because let's assume for a minute that

4    there is a disparity, that there's a difference.  I mean, I

5    assume, am I correct, that there's some judgment that's used

6    when loans are made that, based on various different factors,

7    some people may get a lower rate than others?

8              MR. MCGARRY:  Many different factors, Judge.

9              THE COURT:  Okay.  Hello, hello.

10             MR. FOOTE:  Mr. Foote, Your Honor.

11             THE COURT:  Who is this?

12             MR. FOOTE:  Bob Foote from Chicago.

13             THE COURT:  Okay.  We've started so -- we're in the

14   middle of things so you can listen in.

15             MR. FOOTE:  Sure.

16             THE COURT:  So then let's assume for a minute there's

17   a difference, and we'll call it a disparity.  Let's say there's

18   a difference.  But then presumably, as to two different people

19   with the exact same difference, there could be different

20   results.  In other words, there could be certain people for

21   whom the disparity, if you will, is accounted for and others

22   that it's not accounted for.

23             MR. KLEIN:  That's correct, Your Honor.  The

24   statistical tools are very -- are more than sufficient though

25   to be able to establish, after regression analysis, which

1    factors are in play and which factors are not.  And of course,

2    our experts would walk through the process of how they do their

3    regressions and why.

4           THE COURT:  So then how do you -- so really this -- so

5    is this first effort to identify the class or is it to

6    determine actual liability?

7           MR. KLEIN:  We wouldn't expect --

8           THE COURT:  Because I would presume that the -- if,

9    let's say, your regression analysis was perfect, then you would

10   be able to tell grossly whether or not there is a disparate

11   treatment, right?

12      I mean, if you had perfect regression analysis, in other

13   words, you could factor out all legal discrimination and then

14   you would be left with a comparison of like groups of people,

15   and then if the regression analysis showed a difference -- or I

16   assume there's got to be a significant difference of some kind

17   or another -- then you could say, as a gross matter, there

18   appears to be discrimination.

19          MR. KLEIN:  That's correct, Your Honor.

20          THE COURT:  So what you're doing -- but that doesn't

21   solve the class problem because -- so what it -- I guess I'm

22   sort of asking a question.  What you're doing now is really

23   doing discovery to determine liability.

24          MR. KLEIN:  I would disagree, Your Honor.  With all

25   due respect, I think what we're going to need to be able to

1   show for class certification is that our plaintiffs have

2   disparity levels that make them typical and common for the

3   class.

4       That means we have to do at least a study of sample data

5   but perhaps of all the data in order to put our clients on the

6   continuum -- our plaintiffs on the continuum.

7           THE COURT:  You mean the named plaintiffs?

8           MR. KLEIN:  The named plaintiffs to show that their

9   claims are typical and common to the class claims.

10          THE COURT:  But then how would you define -- assuming

11  you can do that for a moment -- well, of course, can't you

12  right now take your actual plaintiffs and put them in some sort

13  of theoretical continuum anyway or do you -- or in order to

14  show discrimination against them, do you still have to show

15  disparate treatment?

16      There's no facts that you can discern from the

17  investigation of their individual circumstance that suggests

18  that they were discriminated against.

19          MR. KLEIN:  It's an adverse impact case, Your Honor,

20  so we have to be able to show how our clients were affected by

21  the practice, which is a matter of comparison of where our

22  clients fall in the interest rate continuum to similarly-

23  situated white borrowers.

24          THE COURT:  What is the practice that you're talking

25  about?

1          MR. KLEIN:  The practice is a combination of two

2     things, Your Honor.  It's the granting of discretion by

3     Countrywide to a set of third parties who then use that

4     discretion to mark up the rates in order to earn bigger fees.

5          THE COURT:  That means their employees?

6          MR. KLEIN:  They're not always employees.  In some

7     cases the third parties are loan brokers, but the loan brokers

8     are charged with setting the final loan price by Countrywide's

9     policy.

10          THE COURT:  Okay.

11          MR. KLEIN:  The other practice is a practice of using

12     brick and mortar branches in certain neighborhoods so that it's

13     more likely that black and Hispanic borrowers get funneled in

14     through one of the more expensive doors, basically the door

15     where the discretionary pricing takes place.

16          THE COURT:  Doesn't discretionary pricing take place

17     everywhere?

18          MR. KLEIN:  We're still in the midst of discovery to

19     determine exactly the scope of where there is and is not

20     discretionary pricing in Countrywide's loan policies.

21       We have not had a policy and procedures deposition.  The

22     only deposition we've taken so far is the deposition of the

23     gentleman who knows about Countrywide's data and databases.

24          THE COURT:  I mean, so you say they had offices in a

25     lot of different places and some were in poor areas.

1          MR. KLEIN:  Some of the offices were -- I think

2     overall the policies about setting offices made it more likely

3     that black and Hispanic borrowers in the minority community

4     only had access through either the subprime lending door or

5     through a door involving a loan broker, and those loans on

6     average were more expensive.

7        So it's a combination of the two practices, the

8     discretionary pricing practice and the office and branch

9     location decision-making process.

10          THE COURT:  Well, I mean, discretionary pricing

11     doesn't get you anywhere particularly.  I mean, you have to

12     show that the discretion was used discriminatorily.

13          MR. KLEIN:  Correct, Your Honor.

14          THE COURT:  And so how were they funneled?  I mean,

15     was that because there were offices in certain neighborhoods or

16     why is that?

17          MR. KLEIN:  Or lack of offices in certain neighbor-

18     hoods so that the only way to get in to a Countrywide loan was

19     through one of the more expensive loan broker options or

20     through the subprime lender that Countrywide was running.

21     People didn't have equal access to the better products, in

22     other words.

23          THE COURT:  And how did you have equal -- I mean, you

24     just had to go to one of the Countrywide offices, but they

25     were -- didn't have access because they didn't have

1    transportation or didn't know where the office was?

2          MR. KLEIN:  Because the office wasn't located in a

3    place that made it convenient to get into the office that --

4    into that office which was offering the better and cheaper loan

5    products.

6          THE COURT:  Okay.  I mean, do the plaintiffs in the

7    case fit the theoretical profile?  I mean, are they -- I mean,

8    you can't tell -- or can you tell from what you know about

9    them -- you must know that they for some reason got a higher

10   loan than they should have, a higher interest or higher

11   charges.  I mean, you must --

12         MR. KLEIN:  I'm sorry, Your Honor.  I didn't mean to

13   cut you off.

14         THE COURT:  Yeah.

15         MR. KLEIN:  The named plaintiffs have a profile which

16   involves payment of discretionary compensation, but we can't

17   tell whether they paid more or less discretionary compensation

18   than similarly-situated white borrowers without access to the

19   data.

20         THE COURT:  And are all of them people who are still

21   paying on their mortgages and loans?

22         MR. KLEIN:  Some are and some aren't.  I think,

23   unfortunately, at least one of the named plaintiffs has lost

24   her home to foreclosure, was in the process of losing it right

25   around the time the case was filed.

1      Most of the other plaintiffs, it's my understanding,

2   they're still in the loan struggling to make their payments.

3           THE COURT:  I mean, I'm going to ask maybe a dumb

4   question.  Is it permissible under the law -- what kind of

5   distinctions are allowable?  I mean, I assume that if you -- if

6   you charge fees and charges, that to some extent those fees and

7   charges have to be the same for everybody.  You know, like

8   administrative fees and things like that.

9           MR. MCGARRY:  Well, I'll give you an example, Judge,

10  of where --

11          THE COURT:  But that interest rates could vary.  I

12  assume that it's legal to charge people who have worse credit a

13  higher interest rate, as sort of perverse as that might be in

14  some way.

15          MR. MCGARRY:  But it is the way that the industry has

16  worked for years and --

17          THE COURT:  Right, I understand that.

18          MR. MCGARRY:  And so, yeah, you have -- if your credit

19  is worse, you have to pay more because you're more of a risk.

20          THE COURT:  Yes.

21          MR. MCGARRY:  But even fees, there can be distinctions

22  between fees.  And I'll give you one example of something.

23  Let's say a loan officer gets in an application from a -- let's

24  make them race neutral -- so two white borrowers.  So one loan

25  officers gets in a loan application from a white borrower.  In

1    the normal course of processing that loan -- let's say it takes

2    three weeks to four weeks to process the loan from the time it

3    comes in till it's approved and the loan is ready for closing.

4    And maybe they charge -- maybe that loan officer typically

5    charges, say, $200 for a processing fee.

6        Contrast that with a loan officer who takes a loan

7    application on a Friday afternoon.

8            THE COURT:  Are these loan officers always employees

9    or are they sometimes independent agents?

10           MR. MCGARRY:  There are -- it's one of the -- one of

11   the struggles with this case is that the plaintiffs are

12   pursuing a case against every piece of the Countrywide

13   organization that ever made mortgage loans.  And so you have a

14   substantial portion of the business that is what's called

15   retail operations.  So those are Countrywide employees who work

16   for the company.

17       There are -- Mr. Klein described the mortgage broker

18   context.  That's when someone, an individual goes to a third

19   party mortgage broker to help get a loan, and that mortgage

20   broker may use Countrywide, may use PNC, may use, you know, any

21   number of different lenders.

22       There is a separate subsidiary within the company that also

23   does retail loans different from the main portion, which is the

24   consumer markets division.  The plaintiffs have also sued --

25   have sought information about a part of the company that

1    doesn't actually originate loans.  They purchase them once they

2    are closed by another lender but have sued under the same basic

3    theory.  So there's a lot of different arms and legs to this.

4        I mean, Countrywide, during most of the relevant time

5    period, was the largest mortgage lender in the country and at

6    one point did 50 percent of all loans made in the entire

7    country.  So it's a huge, huge percentage.

8        But using my example -- I'm using the example of an

9    employee but it could be --

10           THE COURT:  Yeah, sure.

11           MR. MCGARRY:  -- it could be a mortgage broker.

12       So one guy takes three weeks to do an application, charges

13   the normal $200 processing fee.  Another borrower, another

14   white borrower comes in and comes in on a Friday afternoon

15   because some other amount of financing just fell through and is

16   trying to close the loan the next Wednesday.  So the loan

17   officer works like crazy over the weekend in order to fit

18   that -- get that borrower into a loan so they can close in a

19   short period of time.

20       That loan officer may charge $400 or $500 for his

21   processing fee because he spent that much more time working on

22   that particular loan.  There's no statistical or analysis or

23   regression analysis that's going to tell you what happened in

24   that particular transaction.

25           THE COURT:  And do both the -- would both an employee

1 and an independent contractor or agent under those

2 circumstances typically have the discretion to set that fee

3 within presumably certain limits?

4   MR. MCGARRY:  There's -- talk about the employee

5 context.  I mean, there's going to be limits typically under

6 which -- at certain levels they're going to have to get

7 approval from a branch manager or something along those lines.

8   THE COURT:  On the fee?

9   MR. MCGARRY:  On a fee, on an interest rate.  There's

10 any number of different possibilities.

11  But you had asked the question, is it only interest rate or

12 fees, and I was trying to make the point that sometimes the

13 fees can vary for reasons that no one would dispute have any

14 legitimacy.

15  In my example both of the borrowers were white.  If you

16 change the race of one of the borrowers, the one who comes in

17 on a Friday who wants to close the loan on next Wednesday and

18 make that borrower either a black or Hispanic borrower, does

19 that mean because that they got charged $500, as opposed to

20 $200, that there was some racial disparity there, or does that

21 mean that the loan officer, you know, worked all weekend to try

22 to get this guy into a loan in the course of three days, as

23 opposed to three weeks?  So there are --

24   THE COURT:  But your claims relate to both.

25   MR. MCGARRY:  -- that's just one example.

1           THE COURT:  Your claims relate -- are that in its

2    entirety the process is discriminatory as to the fees charged

3    and to the interest rates?

4           MR. KLEIN:  Where those fees are discretionary, Your

5    Honor, that's correct.

6           THE COURT:  Which would principally be in these

7    initiation fees, that sort of thing?

8           MR. KLEIN:  Well, there's another aspect of it, which

9    is that the rates are also discretionary.  The rates can be

10   marked up at the discretion of an employee.

11          THE COURT:  Sure.

12          MR. KLEIN:  You asked the question about whether there

13   aren't significant business justifications.  And certainly we

14   would concede that, for example, credit score and credit risk

15   are legitimate business justifications.

16      The statistical analysis, the regression analysis that I've

17   been speaking of would take those out, remove them from the

18   consideration according to well-accepted statistical

19   techniques, and what would be left would be a raw disparity.

20   This is the disparity that can't be explained by any race

21   neutral factors and have to be explainable only by race.

22          THE COURT:  Are you primarily talking about -- I mean,

23   I guess interest rates would be the easiest thing to do because

24   the -- again, if you're talking about fees, there could be

25   factors that would be really hard to figure out and run a

1    regression on.

2              MR. KLEIN:  Well --

3              THE COURT:  I mean, if for instance he's correct, I

4    mean, if there's some discretion in charging of fees based on

5    the amount of work involved, that would be really hard to

6    factor in and out.  It would have -- I mean, who knows what it

7    could be.  It could be discriminatory, obviously.  I mean,

8    someone could decide, I'm just going to charge black people

9    more, or it could be -- but if it's legitimate, it would be --

10   there wouldn't be much in the record, unless you've got an

11   individual record to see.

12             MR. KLEIN:  But that's where the use of statistical

13   techniques comes in, Your Honor.  If you aggregate and if you

14   assume, as I think any statistician would, that there's no race

15   linked difference between how much time it takes for a white

16   borrower and a black borrower to close a loan, how much work is

17   involved from the employee or broker standpoint.  At the end of

18   the day, if there's a disparity in the amount of the fees

19   charged, there's no explanation other than race.  And that's

20   because you're looking at aggregate numbers.

21             THE COURT:  Except if it's true, which it probably is

22   true, just based on statistics, that the minority applicants

23   are less well off financially than the white applicants.  If

24   that's true generally over the population, then it would stand

25   to reason that it's going to take more time to develop and

 1     approve someone who is -- a group of people who have more

 2     problems than those who have less problems.  So there's going

 3     to be a difference.

 4        Now, evaluating whether the difference is too much or about

 5     right, that's going to be a hard thing to do.

 6           MR. KLEIN:  What we can do, Your Honor, is again use

 7     the process of regression analysis to take those factors out so

 8     that we really are comparing similarly-situated people, that is

 9     we can compare black and Hispanic borrowers to white borrowers

10     who have exactly the same credit characteristics.

11           THE COURT:  And what you need to do is to -- and so

12     what you're saying is that even to prove the case of the

13     individual plaintiffs we already have, you need to do that.

14           MR. KLEIN:  Yes, Your Honor, in order to establish

15     commonality and typicality.  Our named plaintiffs have to be in

16     the same situation as the entire group of black borrowers.

17     That is they have to be able to establish that after their

18     regression they have a disparity that can't be explained by

19     anything but race.

20           THE COURT:  But couldn't you -- I mean, as to an

21     individual plaintiff, you would know at the time they got their

22     loan, you could look back and historically see what the basic

23     mortgage interest rate was, and you know what their financial

24     circumstances are, that is of your individual plaintiff, and

25     you could pretty roughly tell whether they got a good deal or a

1    bad deal.  I'm not saying whether it's discrimination yet or

2    not, but can't you do that and I -- or have you done that and

3    have determined that they got a bad deal?

4              MR. KLEIN:  We have, Your Honor, and that's in the

5    complaint.  But in order to establish an adverse impact case,

6    we have to be able to use statistics.

7         You know, I would refer the court back to cases like

8    *Hazelwood* and some of the Supreme Court -- the initial

9    evaluation of disparate impact is grounded in information our

10    clients don't have about how their loan compares to a loan that

11    a similarly-situated white person would have gotten.  And

12    there's only one way for them to get it, and that's for them to

13    use the statistics.

14        And then the case law --

15             THE COURT:  Don't you already know?  I mean, they

16    advertise -- I mean, at the time the loans were made, you

17    pretty much know what a person of really good credit, what the

18    interest rate -- you know, within a typically -- you know,

19    within a range of, what, half a percent?  You could tell what a

20    person of good credit is going to have to pay for a mortgage

21    loan, right?  So I presume that the plaintiffs are in some way

22    above that, right?

23             MR. KLEIN:  That's correct, Your Honor.

24             THE COURT:  How much above?

25             MR. KLEIN:  It's hard to -- it's hard to pin down

```
 1    because --
 2            THE COURT:  Well, you can pin it down for those
 3    plaintiffs though because you know who they are and you can pin
 4    it down exactly, right, because you know -- you know what the
 5    interest rate was within about half a point and you know what
 6    they paid.  So I guess I'm asking, what is it?
 7            MR. KLEIN:  We know that our plaintiffs paid marked-up
 8    rates.  And what we don't have -- we're still getting rate
 9    sheets and we're still getting the information we need to
10    evaluate that question, but in order to establish that the fact
11    that their rate is higher than what would be available to them
12    on the rate sheet --
13            THE COURT:  Well, for instance, who is your lead -- or
14    how many lead plaintiffs do you have?
15            MR. KLEIN:  Well, there are five different cases.
16    There are three plaintiffs in my case.
17            THE COURT:  And what kind of interest rates did they
18    get?
19            MR. KLEIN:  They got -- they appear, from looking at
20    their situations from the outside, without having all of the
21    applicable Countrywide policies in front of us, they appear to
22    have had good credit, and they appear to have paid subprime
23    interest rates in each case, meaning above normal rates.
24            THE COURT:  And what would that be?
25            MR. KLEIN:  I don't have it.  I apologize.  I don't
```

```
1     have in my head what the rates were in each transaction.

2               THE COURT:  I mean, how much above standard is it?

3               MR. KLEIN:  It's significantly above standard.

4               THE COURT:  What's significant?  I mean, if -- what

5     time period did this occur?

6               MR. KLEIN:  Two or three percent.

7               THE COURT:  What time period did this occur?  What's

8     the probable range of the class that we're talking?

9               MR. MCGARRY:  The earliest plaintiff -- earliest of

10    the named plaintiffs took a loan in 2004, and the latest took a

11    loan in 2007, of the named plaintiffs.

12              THE COURT:  So we're talking about regular interest

13    rates that would be between 5-1/2 and 7 percent, something like

14    that?  I mean, what did your people pay?

15              MR. KLEIN:  I can look -- I can look that up.

16              THE COURT:  Isn't that about what they -- between

17    2004 --

18              MR. MCGARRY:  It depends on -- I mean, it depends on

19    the loan product.

20              THE COURT:  I'm talking the lower --

21              MR. MCGARRY:  I mean, we're talking about what the 30-

22    year fixed rate loans --

23              THE COURT:  Were these 30-year loans, all these?

24              MR. MCGARRY:  I don't -- well, some of them were, some

25    of them were not.
```

```
 1              THE COURT:  Are you doing all loans or just 30 years

 2    or what are we doing?

 3              MR. KLEIN:  Again, the same process would apply, Your

 4    Honor.  There would be a statistical analysis that would

 5    regress out the difference in the rates, but those would not be

 6    a factor in the analysis.  So you're comparing similarly-

 7    situated minority borrowers to white borrowers.

 8         I'm looking up, Your Honor, the interest rates though on

 9    the individual loan.

10              THE COURT:  Has there been a government -- while

11    you're looking -- has there been a government investigation or

12    something or anything that says that this is occurring or that

13    gives you a head start on this?

14              MR. KLEIN:  Your Honor, we have some results of the

15    investigation that the New York Attorney General performed in

16    2005 or 2006, in which there was a settlement between

17    Countrywide and the attorney general, and they do show

18    disparities.  After the kinds of regression analysis I'm

19    talking about, they do show significant disparities in what

20    white borrowers paid and -- from what black borrowers paid.

21         That's been an issue in our discussions about discovery is

22    that we are looking to get the data that was accessible to the

23    New York Attorney General so that we can replicate those.

24              THE COURT:  The attorney general won't give it to you?

25              MR. KLEIN:  Well, we have asked -- we have made a FOIA
```

```
 1      request.  We did get the results.  We've asked Countrywide for

 2      the underlying data and we have not reached agreement.

 3              THE COURT:  They don't publish that sort of thing when

 4      they settle a public case like that?

 5              MR. KLEIN:  Shockingly not, no.  They don't publish

 6      the underlying data, Your Honor.

 7              MR. HEFFERON:  In part, Your Honor, because it was

 8      contested and rather than -- rather than pursue the issue --

 9      rather than pursue the issue, the company chose to settle with

10      no admission of liability or concession, primarily to provide

11      education to prospective borrowers.  That's, you know, the

12      heart of the settlement, which Mr. Klein --

13              THE COURT:  What did you settle for?  What was the

14      settlement for, the amount?

15              MR. HEFFERON:  How much was it, do you remember?

16              MR. KLEIN:  I wasn't involved.  I thought you were

17      involved.

18              MR. HEFFERON:  I just don't remember.  Primarily

19      educational activities, you know, sort of going out and meeting

20      with prospective borrowers, running homeownership workshops,

21      those sort of things.  There was also some remediation in a

22      very limited fashion of going back and promising to look at

23      certain loan files, sort of one against another.

24              MR. KLEIN:  My understanding is that there was some

25      rewriting of interest rates on then pending loans.
```

```
 1              MR. HEFFERON:  I'd just have to go back and look at it
 2    again.
 3              MR. KLEIN:  To go back to your prior question, Your
 4    Honor, the -- two of the three plaintiffs paid interest rates,
 5    effective rates above 8 percent.  The third plaintiff,
 6    Ms. Miller, who is the -- was the lead plaintiff when we filed,
 7    paid an effective rate of 11-1/2 percent.  And as far as we can
 8    tell, looking at her credit record, she had excellent credit at
 9    the time.
10              THE COURT:  And then how many other plaintiffs are
11    there?
12              MR. KLEIN:  There's at least one plaintiff in the
13    Garcia v. Countrywide case.
14              MR. HEFFERON:  Two from Illinois.
15              MR. KLEIN:  Two in the Illinois case, which was
16    transferred here.  And I think there's another plaintiff in
17    Mr. Foote's case, which was filed here and transferred to you.
18              THE COURT:  And so in order to -- so the process of
19    your discovery, you're going to try to get information on
20    what -- do we have a five -- what, how many years, what period
21    of years are we talking about here?
22              MR. KLEIN:  We have narrowed our requests to loans
23    made after January 1st, 2001.
24              THE COURT:  So 2001 to when, to current?
25              MR. KLEIN:  To current, yes.
```

```
 1              MR. MCGARRY:  Respectfully, the request last week
 2     actually narrowed it to January 1st, 2002, but --
 3              MR. KLEIN:  That's correct, Your Honor.  We have been
 4     working to narrow the differences that we have.
 5              MR. MCGARRY:  And we have produced substantial
 6     documents and have suggested that we shouldn't be going back
 7     before 2005, certainly not before 2004, when the first loan was
 8     made in this case.
 9              MR. HEFFERON:  And it is a two-year statute of
10     limitations.
11              THE COURT:  When was the first case filed?  So that
12     would sort of limit it, right, wouldn't it?
13              MR. MCGARRY:  In our view it would.
14              MR. KLEIN:  Your Honor, in one of the cases --
15              THE COURT:  What would be --
16              MR. MCGARRY:  The first case was filed in July of
17     2007, so you would be going back to the middle of 2005.
18              MR. KLEIN:  Judge Gertner in that case, before it was
19     transferred to you, did conclude that the limitations paid was
20     effectively tolled under the violations doctrine so that
21     there's at least one plaintiff in the first filed case who is
22     outside that two-year period, and Judge Gertner has allowed her
23     claims to stand.
24              THE COURT:  And so what would that say about -- does
25     that mean that -- assuming that ruling is adopted, does that --
```

1    how far back can you go in terms of a class?

2         MR. KLEIN:  The argument under the continuing

3    violations doctrine is that you can go back as far as the

4    policy and procedure existed, when the -- as far back as when

5    the policy and procedure was put into place.  We probably --

6         THE COURT:  So that's going to be a big argument right

7    off the get-go.

8         MR. MCGARRY:  It has been.  And interestingly enough,

9    there's a case decided by a judge in the Central District of

10   California just last week which rejected the very conclusion

11   that Judge Gertner reached in this case.  So it's, you know,

12   a --

13        THE COURT:  Well, maybe we should decide that issue to

14   begin with because that is a pretty big issue.

15        MR. HEFFERON:  I would point out, I think that's

16   right, Judge, because on the issue of, for example, brokers,

17   brokers have been, you know, doing this kind of discretionary

18   pricing forever as far as my understanding of how brokers

19   operate.  And I don't think anybody -- plaintiff, I don't

20   think, would purport that they would want to go back forever

21   but -- and the records certainly won't go back forever.  The

22   plaintiff's original position was to go back to '01, was it,

23   Gary?

24        MR. KLEIN:  That's correct, and we've modified that

25   and we're continuing to talk.  And there's at least a chance

1    that we'll modify that again.

2        I think there is a possibility that we'll come to you with

3    a position in the context of a motion to compel or some

4    disagreement about how discovery should proceed, at which you

5    would have to evaluate how far back we can go.

6        I would point out that in addition to the continuing

7    violations argument that's still in the case by virtue of Judge

8    Gertner's decision, the relevance here quite possibly goes back

9    to allow discovery of data and information prior to the

10   beginning of the statute of limitations, that is that

11   information is relevant because it tends to establish how long

12   the defendant would have known about the problems and how long

13   the policy was -- the challenged policy was in effect.

14            THE COURT:  Well, to prove a violation, you don't have

15   to really have disparate impact that leads to the inference

16   itself of knowledge.  I mean --

17            MR. KLEIN:  Correct.

18            THE COURT:  -- and the only knowledge you really --

19   so --

20            MR. MCGARRY:  But there's no --

21            THE COURT:  I'm not sure that --

22            MR. MCGARRY:  There's no allegation in this case -- I

23   didn't mean to interrupt you, Judge -- there's no allegation in

24   this case from the plaintiffs that there was intentional

25   discrimination on the part of Countrywide.

1          THE COURT:  Right.  They don't have to prove

2     knowledge.  All they have to do is just prove that whatever the

3     policy was had a disparate impact.  And the only relevance and

4     the only conduct that's relevant is the conduct during the time

5     that you can get damages for.

6          So I would think, just off the top of my head, that if --

7     if the reason for getting -- of course, there's a lot of ifs

8     here -- if the continuing violation theory doesn't fit, then

9     there would be -- then you would have to -- and the evidence of

10     things prior to 2005 are -- it wouldn't seem to be relevant,

11     number one.

12          But if it has a marginal relevance, you know, the cost of

13     getting all that stuff would be -- would seem to weigh --

14     outweigh the potential value of it because in terms of the

15     disparate impact, all you have to show is disparate impact

16     during the time.

17          I mean, it wouldn't -- I mean, let's say there was no

18     disparate impact prior to 2005, it wouldn't matter.  It

19     wouldn't hurt you in that case.  It doesn't really help you if

20     it -- if there was disparate impact because all your claim is

21     that during whatever time period you can get to there was

22     disparate impact, right?

23          MR. KLEIN:  That's true, Your Honor.  I would want to

24     address the cost issue just a little bit, which --

25          THE COURT:  Well, I mean, the -- I think the relevance

1    issue.  I mean, if -- and there really is almost no relevance.

2    I mean, there could be some relevance of course about the

3    initiation of the policy, whatever that was, but that's a far

4    different thing.  So I'm not saying there wouldn't be discovery

5    prior to 2005.

6        There could, obviously, be -- there would need to be

7    discovery about if there is a policy that creates the disparate

8    impact, you know, when was it adopted and initiated.  But

9    that's different than this -- all this discovery of all the

10   different loans and all that sort of stuff, which I would think

11   would be very, very expensive and difficult.  Just taking the

12   depositions of people who started the policy, whenever that

13   was, that's not a problem, but the other stuff is what I'm

14   talking about.

15       So I guess that gets back to my question only, and that is

16   whether in view of this and in view of your ongoing

17   discussions, is the matter of the continuing violation -- to

18   what extent is that a strictly legal question based on your

19   allegations?  You make the allegations and then we test it to

20   see, you know, whether or not there's a viable claim there

21   because otherwise there's no point in -- it certainly would be

22   better for everybody to limit discovery to what's going to be

23   important for the case.  Does that make sense to you or not?

24           MR. KLEIN:  It does make sense, Your Honor.  I think

25   for the purposes of discovery, which is really the only open

1    issue right now, we can certainly take your views into account

2    in evaluating the kinds of agreements we might reach to move

3    the process for data discovery along.

4        THE COURT:  Okay.  Well, like you say, it's going to

5    come in -- it could come up quickly if they force the issue or

6    if we do it by agreement, or if it's not, then the question of

7    continuing violation will just sort of come up at a later time,

8    I suppose.  Or it may not be an issue at all if in fact --

9    well, depending on what you --

10       MR. KLEIN:  I mean, I would think the latest it would

11   come up is in the context of a summary judgment motion but,

12   yes, Your Honor, it will come up.

13       THE COURT:  Well, it's going to come up before class

14   certification because assuming, presumably, the class will be

15   defined in some degree by people who got mortgages in a certain

16   period of time.

17       MR. KLEIN:  That's fair enough, Your Honor.

18       THE COURT:  So I guess also -- I mean, you'll take all

19   these plaintiff's depositions during this class certification

20   period, obviously.

21       MR. MCGARRY:  We will.

22       THE COURT:  And do you have any idea how many

23   different classes there might be, different segments of

24   classes, subclasses?  I assume there have got to be more than a

25   couple because, I mean, we already know at least a couple

1    possibilities.

2          MR. KLEIN:  Your Honor, in these cases where they have

3    been litigated, there aren't necessarily a lot of

4    stratifications in the ultimate class definition.  And that's

5    because at the end of the day, when you use the statistical

6    analysis and you're comparing similarly-situated individuals,

7    the disparities tend to run across the entire class.

8          We don't necessarily, in our view, need a separate class

9    for each -- each group of similarly-situated individuals.  I

10   think where we may see some need for subclasses is, as

11   Mr. McGarry describes, in the context of the wholesale versus

12   retail lending issue and then again in the context of those two

13   issues compared to what's called the correspondent lending

14   channel, which is where lenders close loans and transfer them

15   to Countrywide virtually as soon as they're closed based on

16   Countrywide's policies for buying them.

17         THE COURT:  What kind of data do you all have?  I

18   mean, let's leave aside the question of the years, but let's

19   just say for the two-year period, 2005 to 2007, what kind of

20   general information can you provide and will there be a lot of

21   dispute about that?

22         MR. MCGARRY:  Well, there's a -- there's the issue of

23   what type of data is available, will it be provided, and

24   there's also issues about when it will be provided.

25         I mean, one of the struggles that we're having now is that

1   from the defendant's view -- the plaintiffs have already taken

2   a deposition to learn about what types of data are available.

3   We had a six-hour deposition about that topic.

4           THE COURT:  Okay.

5           MR. MCGARRY:  And from the defendant's perspective,

6   their experts can't determine whether or not they would be able

7   to do a regression analysis if they know the types of data

8   points that are available.

9       At the class certification stage, the issue is not whether

10  there's a disparate impact.  The issue at the class

11  certification stage is will they be able to ultimately make a

12  case on a disparate impact basis.  So the --

13          THE COURT:  So you're saying they don't even need this

14  stuff for class certification?

15          MR. MCGARRY:  I don't think they need it at all for

16  class certification because the -- at the end of the day --

17          THE COURT:  So we're just going to assume that --

18  well, then we're put in a position of assuming there is a

19  violation, there are -- there is a disparate impact.

20          MR. MCGARRY:  Well, the -- for purposes of class

21  certification, all right, the issue isn't going to be there is

22  a disparate impact as to plaintiff A or plaintiff B, and

23  therefore, these people are proper representatives for the

24  entire class.  The issue is going to be can we try this case on

25  a class basis.  Is it susceptible -- are the types of proof

1    that will be needed at trial susceptible to class treatment?

2        It's not the plaintiffs' position -- in fact, it would be

3    inappropriate for the plaintiffs to try to prove their

4    liability case at the class certification stage because that's

5    just a procedural ruling.

6        So the issue really at class certification is now that they

7    know all the types of data that are available -- and we have,

8    you know, a few discovery disputes about, you know, whether we

9    give, you know, some additional data dictionaries or electronic

10   information that will list out the types of data that are

11   available.

12       The experts who do this kind of analysis know what data

13   points they need.  We've told them the types of data that are

14   available.  They should be able to put on a class certification

15   case that says, okay, my expert says if I have points A through

16   E, I can run a regression analysis.  And that's the type of

17   analysis we'll do when we ultimately reach the merits.

18       The idea of providing every single piece of underlying data

19   for every single loan made by every single lending division of

20   Countrywide over a two, three, five, seven-year period prior to

21   class certification doesn't make any sense from our

22   perspective.  And frankly, we're concerned that what the

23   plaintiffs are going to try to do is to try their liability

24   case in the context of class certification.  But putting aside

25   that concern, there's just not a need for it at this stage.  So

1     that's the timing issue.

2          In terms of the types of data, in response to your

3     question, there -- there are any number of different data

4     points available, including, you know, the name, address of the

5     borrower, the amount of the loan, the rate of the loan, the

6     race of the borrower, the --

7          THE COURT:  Well, essentially what they're going to

8     do, aren't they, is say -- whether they do it with real data or

9     not the real data, is they're going to say we're going to run a

10    regression analysis.  And after you factor out all the

11    legitimate factors, our analysis is going to show that

12    Countrywide made certain groups of people pay a higher interest

13    rate than other groups of people.  And so they got that.

14         And then they're going to say, we're going to define the

15    class as all those people within a two-year period, all those

16    African-Americans and Hispanics who got a loan within the

17    two-year period and whose individual circumstances fall

18    outside, you know, one deviation of whatever we establish is

19    normal, and that's going to be the class.  And then you send

20    out the notice to all the people.  And then that's going to be

21    a huge task defining who's in and out of the class, but isn't

22    that -- would that be the way you would do it or not?  How

23    would you do it?

24         MR. KLEIN:  It would be something like that, Your

25    Honor, and, you know, I think Mr. McGarry's conception of how

1    we would proceed for class certification is partially right.  I

2    mean, certainly we have to be able to show that the analysis we

3    would expect to do is feasible and manageable and the data is

4    available for us to be able to do it.

5        I think the problem is, as Your Honor knows, for the

6    purpose of class certification, two of the key elements are

7    proving commonality and typicality.

8        And in order to prove commonality in this context, what we

9    have to show is that the named plaintiff suffered a disparity,

10   the basis on which the disparity and that the disparity is the

11   same as other individuals who would be included in the class.

12   So we do have to do -- it seems to us, unless the defendants

13   stipulate to commonality and typicality, we do have to do

14   sufficient data analysis to establish that our clients were

15   discriminated against, were impacted by the policy, and that

16   they're typical of -- and that they're typical of other class

17   members in that they have a disparity typical of other class

18   member's disparity and that does require at least a --

19            THE COURT:  What are you going to argue if they come

20   in and say -- I mean, let's say they don't get the discovery

21   and they come in and their experts -- I mean, it's going to be

22   impossible to cross-examine the experts because, you know,

23   they're presenting a theory.  And, you know, you can't -- I

24   mean, what are you going to say to them?

25        They're going to say, you know, here's what we would prove

1    when we get the data.  We're going to show there's a disparity.

2    And we're going to say that once you factor out all the

3    factors, if anybody has a -- is given an interest rate that

4    varies beyond X, then you can't explain that.  Obviously,

5    there's some range, you know, just -- but that if the -- if it

6    falls outside the range, there's no explanation for it, other

7    than race.  And so all those people are going to be in a class,

8    you know.  So then they're going to be all affected in the same

9    way.  I mean, then you got your class.  How do you argue

10   against that?

11         MR. MCGARRY:  I think part of it is that, you know,

12   invariably this case, probably both precertification and

13   postcertification, is going to involve different experts

14   opining on what's appropriate or not.

15       So part of what I anticipate is they will say, you know,

16   these 20 factors are what should be looked at.  And I imagine

17   that the dispute is going to involve what factors are not

18   considered.

19       So using my example earlier of the loan officer who worked

20   over the weekend to get a loan done --

21         THE COURT:  Let's leave aside that.  Let's just purely

22   do interest rates.  It's simpler.

23       You know, what -- I mean, they're going to be -- pretty

24   much you're going to agree to a huge extent on what's

25   reasonable and not reasonable to use in evaluating interest

1    rates, right?

2         MR. MCGARRY:  I'm not sure that's right either.  I

3    mean, you use the example of a borrower who makes a decision

4    that I would rather not pay points and pay a higher interest

5    rate, for instance, or I would rather take an adjustable rate

6    loan -- I mean, you know, you can't avoid reading about this in

7    the news today, about people who took adjustable rate loans and

8    now with -- expecting they would refinance and with housing

9    prices going down, are having trouble making --

10        THE COURT:  Are we going to do adjustable rate loans

11   in this also?

12        MR. KLEIN:  Yes, sir.  Even adjustable rate loans have

13   interest rates and they're comparable on the same basis that

14   fixed rate loans are comparable, meaning that you can look at

15   the rates provided and if there's a disparity that's

16   unexplainable by factors other than race, there's

17   discrimination.

18        THE COURT:  Which rate are we going to look at, the

19   first or the second rate?

20        MR. KLEIN:  The blended rate.  I mean, that's the

21   point at which, I think, we have to move over to the annual

22   percentage rate because what that does is it takes the rate

23   under rules set by the Federal Reserve Board.

24        THE COURT:  So some of your plaintiffs are adjustable

25   rate?

1          MR. KLEIN:  They are, Your Honor.

2          MR. HEFFERON:  Your Honor, I point out, as Mr. McGarry

3     said, many people choose to pay no points and they instead,

4     therefore, have a higher interest rate.  So in those instances,

5     you have to have -- you have difficulty, obviously, comparing

6     those folks with people who may have paid $1,200 up front or

7     whatever.

8          THE COURT:  I mean, would you disagree or agree with

9     that point?

10          MR. KLEIN:  I totally disagree.  I mean, I think that

11     at the end of the day --

12          THE COURT:  You would disagree with that?

13          MR. KLEIN:  Tom and I almost always disagree.

14          THE COURT:  You wouldn't disagree with the fact that

15     someone who pays points might well pay a -- well, someone who

16     doesn't want to pay points might pay a higher interest rate.

17          MR. KLEIN:  Yes, I disagree about the impact of that

18     on this case is where I was -- I thought you were going.

19          THE COURT:  But so that would be a factor you -- in

20     your regression analysis, one factor would have to be, if

21     someone doesn't pay points, that means usually you're going to

22     pay -- you could pay a higher interest rate, if it -- in a

23     situation like Countrywide.

24          MR. HEFFERON:  That's correct.

25          THE COURT:  Now, do points vary depending on whether

1 the loan is brought to you or whether you initiate it?

2   MR. MCGARRY:  The points can vary on any number of

3 different scenarios, whether -- and you know, then the point I

4 was trying to get at is what no statistical analysis is going

5 to tell you is the discussion that took place between that

6 borrower and that loan officer or that borrower and that third

7 party mortgage broker.

8   THE COURT:  That's on an individual case.  But on a

9 gross disparate treatment, you know, they're not all -- you

10 know, they're just going to proffer that there's a disparity

11 and not a disparity that has anything to do with, you know,

12 what they may have discussed across the table from each other.

13 That kind of disparity is going to be within any reasonable

14 margin of statistical error that there can be variances of

15 probably up to, you know, a half a point, even a point on all

16 kinds of circumstances when you combine all the circumstances.

17 What they're going to prove and what their experts are

18 going to say, right, is that there's, beyond the -- you know,

19 the statistical -- I mean, there are factors that affect rate

20 and then there's statistical variances.  And what our class of

21 people -- I'm not trying to put words in your mouth -- are

22 going to be those who are above and beyond all that.

23   MR. KLEIN:  Correct, Your Honor.

24   MR. MCGARRY:  I think the ultimate dispute is going to

25 be what is the right analysis, what factors should be

1    considered, what factors can't be considered for the reasons

2    that I articulated.

3         THE COURT:  Well, like what are you all going to

4    differ on, on what -- I mean, you're saying that certain

5    factors can be considered that they say can't?

6         MR. MCGARRY:  No, no, no.  I'm saying that the manner

7    in which various factors are considered, the weight that

8    they're given, all those type of things are going to be things

9    that, I think, ultimately the experts are going to disagree on

10   and which Your Honor or a jury is ultimately going to decide

11   who is right.

12        THE COURT:  Like what factors are they going to

13   disagree on?

14        MR. MCGARRY:  I'm drawing a blank.  I'm reasonably

15   confident there will be disagreements between the experts.

16        THE COURT:  What would there be?  I'm just -- I don't

17   know enough about the industry to know, but I would think there

18   would be some sort of general agreement as to what factors

19   could be considered.

20        MR. MCGARRY:  Well, I think there -- I think

21   there's -- you know, there are going -- certainly going to be a

22   series of main factors that are considered but then there's

23   going to be the issue of do you look at whether there's a

24   disparate impact on a particular portfolio of loans done by a

25   loan officer or at --

1          THE COURT:  What's that again?  Say that again.

2          MR. MCGARRY:  Do you look at whether there's a --

3    I'm -- to give you a couple of examples of different ways you

4    can look at the same issue.  One is as small as loan officer A,

5    what is his loan portfolio like?  Are his loans higher to

6    minorities than white borrowers, for instance, as opposed to --

7          THE COURT:  That's not going to be -- when you

8    consider them all in, that's not going to be a big factor.  All

9    those are going to even out.

10         MR. MCGARRY:  But I think, among other things, you

11   need to look at relevant geographic markets, for instance.  And

12   then there's a difference between do you look at a particular

13   town?  Do you look at what's called the MSA, which is a larger

14   geographic area surrounding a particular area?

15      I mean, you need to look at a loan in Louisville, Kentucky

16   to compare to another loan in Louisville, Kentucky, as opposed

17   to a loan in Louisville, Kentucky to a loan in Boston.

18         THE COURT:  But they're saying the whole company

19   discriminated, right?  You're not saying they discriminated

20   only in Boston.

21         MR. KLEIN:  That's correct, Your Honor.  But again,

22   that analysis that Mr. McGarry's concerned about can be done by

23   means of regression.

24      You know, certainly we're going to concede all the big

25   points that would be raised on the defense side of this case.

1    We're going to concede that there can be disparities that are

2    grounded in differences in credit characteristics, in credit

3    score, for example.  But again, the statistical technique takes

4    those out.  That's what regression does.

5         THE COURT:  Are the credit scores accurate enough and

6    consistent enough that they can be used as a basis for

7    comparing?  In other words, if you just took the credit scores

8    of everybody and then compared that to the interest rate they

9    received on their mortgage, would you find a statistically

10   consistent pattern?

11        MR. HEFFERON:  Your Honor, I think the answer to that

12   is at some level of generality you find a correlation.  Whether

13   it be, you know, high or low, it's going to depend on a lot of

14   things, but in making a loan, a mortgage lender is going to

15   look at credit score, as well as things like what's their

16   income versus how big the loan is going to be.

17        THE COURT:  Sure.

18        MR. HEFFERON:  Which may or may not be -- have any

19   relation to your credit store.  You could have a great credit

20   score but it turned out to be buying a house way beyond your

21   means.

22        THE COURT:  Right.

23        MR. HEFFERON:  So there's going to be some correlation

24   but how much of a correlation is going to depend.

25     And frankly, again, it's going to depend geographically.

1    Certain areas of the country you're going to find that people

2    are generally more conservative.  You're going to have a higher

3    correlation because they're not taking on homes that are too

4    lavish and things like that.  Whereas, other areas you might

5    find there's a high correlation -- a low correlation.  So

6    everything is very local and this is a very local business,

7    such that Countrywide had many local offices, as Mr. Klein

8    pointed out.

9        So I think one of the factors that we'll certainly want to

10   be challenging or asking about is the extent to which the

11   geographic areas may be taken into account by the statistical

12   analysis.

13            THE COURT:  Do you have a credit score for everybody,

14   basically everybody?

15            MR. HEFFERON:  Basically everybody, yes, but of

16   course, everybody's got three credit scores and they're a

17   little different.

18            THE COURT:  Really?

19            MR. HEFFERON:  Generally within a range but yes.

20            THE COURT:  What you do mean they have three?

21            MR. HEFFERON:  You might have Equifax and Spherion and

22   TransUnion and they have three different numbers because they

23   have slightly different ways of calculating.

24            THE COURT:  So how important are the credit factors,

25   the credit scores?

1          MR. KLEIN:  They will explain some part of the

2     disparity, Your Honor, but they won't explain all of it.  So we

3     will be able, using regression --

4          THE COURT:  So with the credit scores can you

5     basically eliminate a whole lot of people as plaintiffs or not?

6          MR. KLEIN:  No.  What we can do is eliminate a whole

7     lot of the disparity.  I mean, everyone knows that there's a

8     disparity based on demographics in this country, and we're

9     going to concede that as part of the analysis we perform.

10         THE COURT:  How do you get at the whole -- I mean, how

11    do you analyze the information, assuming you start with credit

12    score?  But obviously, then as you suggest, I mean, there are a

13    couple of other factors, I think, that would be key.  I mean,

14    credit score would be key, just to begin with, although you can

15    look behind the credit scores and that can hugely vary.

16        But I guess the next thing would be -- well, it's a

17    combination of two things -- would be the value of the house

18    you're buying.  Well, the -- well, the amount of the mortgage,

19    which is a proxy for the value of the house, and the amount of

20    your income and there being a relationship between the two,

21    which is positively or negative.

22        But then the other factor -- of course, you would know both

23    those things.  Presumably at least they would give you what

24    they say is their income, which that could -- I mean, I doubt

25    in -- what percentage of people lie about their income on their

1    mortgage return, 25 percent?

2              MR. HEFFERON:  That's a good question.  I think you

3    get different opinions based on press reports, but there

4    certainly -- and that is a complicating factor here though

5    because there's some loans that were made --

6              THE COURT:  But, I mean, is it as high as 25 percent?

7              MR. HEFFERON:  I don't think it's as high as 25

8    percent.  Some loans made with very little documentation of

9    income in this group and some loans with a lot of

10   documentation.  If you require somebody to give you W-2s,

11   that's a --

12             THE COURT:  But mostly they don't do that.

13             MR. HEFFERON:  Well, again, it depends on the areas.

14             THE COURT:  Anyway, my next thing was how do you get

15   at the other big factor would be, you know, what their family

16   budget is, that is whether they have excess funds or not.  And

17   that's -- boy, I bet you nobody tells the truth on that.  I

18   mean, if 15 percent lie about their income, 50 percent can't

19   tell you what their -- you know, what they spend monthly on

20   various different things.  And then, therefore, whether they

21   have extra money left over to pay a mortgage.

22        So, I mean, do you have that kind of information?  If so,

23   that would be a key -- I mean, whatever they tell you and

24   whether it's true or not or whether the person getting the

25   information believes them or not is a big factor, isn't it?

1          MR. HEFFERON:  There's some information electronically

2     but some information which is in only paper, and there's some

3     information -- and frankly, you might have a conversation

4     between the broker and the borrower about what they're likely

5     to be able to pay.  So I mean, there's a mix.

6          THE COURT:  Is that all a factor or not?

7          MR. KLEIN:  There are two factors at issue in what

8     you're describing, Your Honor.  One is loan to value, the

9     amount of the loan as a ratio against the value of the

10    property.  That's information that's in Countrywide's records,

11    and again, can be -- it can be taken out in regression.  Again,

12    that will explain some part of the disparity.

13         THE COURT:  But how significant is that in determining

14    the interest rate?

15         MR. HEFFERON:  It's very significant in certain types

16    of loans.

17         THE COURT:  Really?

18         MR. HEFFERON:  Absolutely.

19         THE COURT:  Like what kind, subprime?

20         MR. HEFFERON:  The higher leverage loans.  I mean, if

21    you have a loan that's going to be 95 percent loan to value,

22    it's going to be very significant.  If it's 60 percent loan to

23    value, frankly, there's not much risk in that loan so probably

24    won't have much of an impact.

25         THE COURT:  But does that affect the interest rate?

 1                MR. HEFFERON:  Sure.

 2                MR. MCGARRY:  Yes.

 3                MR. HEFFERON:  There are, for example, in a particular

 4     loan, you might have the exact same loan product, let's say a

 5     30-year fixed loan, and if your loan-to-value ratio is 60

 6     percent, the rate might be 5 percent.  If your loan to value

 7     ratio is 95 percent, it might be 5-1/2 because there's more

 8     risk to the company having a loan that only has a 5 percent

 9     equity rather than 40.

10                THE COURT:  I see.

11                MR. HEFFERON:  So those two loans to identically-

12     situated people, may be one black, one white, but the loan-to-

13     value may well lead to a perfectly objective and

14     nonobjectionable difference between the loan interest rate.

15                THE COURT:  Well, that would be true, right?

16                MR. KLEIN:  That's correct, Your Honor.  But again,

17     it's exactly what statisticians do.  They can compare people

18     across -- take those factors out.

19                THE COURT:  I'm not saying they can't.

20                MR. KLEIN:  That -- the same thing with the debt-to-

21     income ratio.  There's -- you know, people have a certain

22     amount of debt and their income is X and their available

23     resources to pay the mortgage is Y.  Those -- we would plan to

24     rely on exactly the same information that Countrywide relied on

25     in the rate-setting process because that's the information

1    that's available in its database.

2            THE COURT:  And then so how would you -- assuming

3    you -- your experts are going to do the regression analysis,

4    describe how they do it and then if you're denied -- if they

5    have their way and you don't get your discovery, they're just

6    going to tell you what -- they're going to say what they think

7    the results are going to be and here are all the factors.  And

8    so then how would you then define the class?

9            MR. KLEIN:  Well, that's the problem, Your Honor.

10   That's why we believe we need the data so that we can--

11           THE COURT:  No.  I mean, how would you theoretically

12   define the class?  It's easier to theoretically describe it.  I

13   mean, you're not going to be able to ever identify individuals.

14   People are going to have to self-identify, right?

15           MR. KLEIN:  No.

16           THE COURT:  It won't matter whether -- I mean, I'll

17   ask it this way.  Whether you get the information or not, if

18   you don't get the information, you're going to be able to

19   theoretically define the class.  Here are the criteria that

20   will establish who's in our class.

21       If you do get the information, you will be able to actually

22   define the class.  We've actually done the regression analysis

23   and here are the criteria.

24       Either way, am I correct, that the only way you will be

25   able to define the class is to set certain statistical

1    parameters, these are the kinds of people that are in the

2    class, or am I wrong about that?

3              MR. KLEIN:  I would say that at the end of the day, if

4    we show a disparity, that blacks on average paid $500 more than

5    similarly-situated whites, that every black borrower is

6    affected by that disparity.

7              THE COURT:  Well, that's simply not true.  We know

8    that's not true, unless they discriminated against every single

9    black person.

10             MR. KLEIN:  Well, that's the adverse impact in the

11   process.  If you take out all these other factors and blacks on

12   average are paying 500 more, it really doesn't matter whether

13   the black borrower paid more or less.

14             THE COURT:  Yes, it does, absolutely.

15             MR. KLEIN:  Because --

16             THE COURT:  I would think so.  I mean, in a

17   discrimination case, once you decide -- I mean, you still have

18   to -- I mean, there could be people in the class that have one

19   characteristic of the group that's discriminated against.

20        I mean, I thought you had already admitted that -- pretty

21   much that not every black person and not every Hispanic person

22   was discriminated against.

23             MR. KLEIN:  Everyone -- that's what adverse impact is,

24   Your Honor.  If there's an adverse impact that's shown by the

25   data, everyone is affected by that adverse impact.  That is to

1    say, the assumption that a statistician would make, and I think

2    with very good reason -- and I think you'll see that we'll have

3    Harvard and Yale professors in your courtroom to establish this

4    for you, that -- that a black borrower who got even a below

5    normal rate would have gotten an even lower rate and was

6    affected by that same $500 disparity.  That is, if you show

7    that there's an average disparity, every minority borrower is

8    affected for the purposes of adverse impact analysis by that

9    disparity.

10          MR. HEFFERON:  Your Honor, the --

11          THE COURT:  Yeah, but you're not even going to try to

12   show that.  I mean, you're going to show that certain -- what

13   the -- what your analysis is going to show, it's got to show

14   this because the other is almost impossible because, you know,

15   the laws of probability are that -- well, for instance, you

16   know, black persons who make a lot of money and don't have a

17   lot of debts and live in a nice area of town are going to get

18   the same interest rate as white people who have the same

19   characteristics.

20       What the analysis is going to show, I would think, is that

21   just like you said -- this is why I asked the question -- it's

22   not those people that are discriminated against.  It's the

23   people who -- the subprime people who are discriminated against

24   who have to get, you know, the higher interest rates.

25       And your very plaintiffs are -- I mean, if your plaintiff

1    was a great credit risk, she would have gotten a 5-1/2 percent

2    loan, not seven.  So it's not the people who -- I mean, what

3    you're saying can't be true.

4              MR. KLEIN:  Your Honor --

5              THE COURT:  I mean --

6              MR. KLEIN:  -- I have been doing civil rights work for

7    25 years now.  I would say that -- you know, and again, we

8    don't have the data and I can't tell you as I'm sitting here

9    that I know what the data is going to show, but I would say

10   that it's very likely that when we do have the data that we'll

11   find discrimination at every income level, at every demographic

12   and every geographic area.  Every place that we can find

13   discrimination, it will be present.

14      And, you know, I worry that you're going to ask me the

15   question about why, but the reality is we still live in a

16   society that discriminate against black and Hispanic -- blacks

17   and Hispanics.

18             MR. HEFFERON:  Your Honor, I would say that I think

19   the evident reason why plaintiffs are taking this approach is

20   because the Sixth Circuit had already said in the *Coleman v.*

21   *GMC* case that you cannot have a class and --

22             THE COURT:  You cannot have a class like what?

23             MR. HEFFERON:  You cannot have a class like this case

24   and provide any type of monetary relief which is particular to

25   the individual.  And so therefore, that's why the plaintiff's

1    theory is that every, you know, black university professor at

2    Yale Law School gets $500 or whatever the average amount of

3    money to be, if that's proven, because otherwise they are not

4    going to be able to get a class certified.  So that's why they

5    retreated to that --

6             THE COURT:  Because it's all individual.

7             MR. HEFFERON:  Exactly.

8             THE COURT:  It's too individual.

9             MR. HEFFERON:  Exactly.  And that's what the Sixth

10   Circuit said in the *Coleman* case.  And that was even under

11   23(b)(2), which is, you know, the part of the rule -- not the

12   damages part of the rule, which is 23(b)(3), but it says under

13   23(b)(2).

14            THE COURT:  So what do you say that the *Coleman* case

15   says, that as matter of law you can't have that kind of class?

16            MR. HEFFERON:  That's correct, because the individual

17   -- both because the individualized nature of the remedy and

18   also because it's not necessary because it's a fee-shaping

19   statute.  And therefore, the idea that you need to have a class

20   action in order to collect small claims together is not true in

21   this instance.  In fact, in this instance, obviously, we're

22   talking about mortgage loans.  And if the plaintiffs are right,

23   we're talking probably a lot more than $500 for a lot of

24   people.

25        But anyway, that's what's *Coleman* says.  I mean, I'm sure

1    we'll talk about *Coleman* at other times in the case, both in

2    the district court opinion as well as the circuit court

3    opinions.

4            THE COURT:  Why wouldn't we decide that in advance, if

5    that -- if you're saying it's that straightforward?  Why

6    couldn't we, if in fact -- I haven't read the case so I don't

7    know -- but if the case says you can't have a class like this

8    and they want a class like that, why don't we decide that up

9    front, if it's possible to decide?

10           MR. HEFFERON:  Well, Your Honor, I would say I'm not

11   even sure that's necessary to decide, since the opinion is what

12   it is.  It specifically says that.

13           THE COURT:  Well, if it says what you say and he's

14   saying what kind of class he wants, then why are we here?

15   Somebody's right and somebody's wrong.

16           MR. KLEIN:  Without accusing Mr. Hefferon of

17   misleading the court, I don't think it says exactly what he

18   says it says.  I was involved in the *Coleman* case.

19           THE COURT:  Well, that's probably true.  Otherwise --

20           MR. KLEIN:  And when it was decided, I was one of the

21   lawyers for Ms. Coleman.

22       And I agree with part of what Mr. Hefferon says, which is

23   that we acknowledge that it would be difficult to certify a

24   class under (b)(3), but the *Coleman* decision absolutely leaves

25   open the possibility of (b)(2) certification.  And with that

1     comes a whole set of questions about what kind of monetary

2     relief is available by way of disgorgement, injunction, remedy

3     for unjust enrichment under 23(b)(2) so --

4              THE COURT:  But see, you're going to have a whole --

5     if you run your regression analysis, I mean, the statistics --

6     I'm not a statistician, but I -- tell me if you disagree.

7              MR. KLEIN:  You will be before the end of the case.

8              THE COURT:  No.  Tell me if you disagree.  The

9     regression analysis will absolutely show that a certain number

10    of Mexicans and African-Americans fall within a statistically-

11    acceptable probability that is -- that is not in the area where

12    the discriminatory disparate impact would account for it.

13    That's going to happen.

14             MR. KLEIN:  I'm not a statistician either.

15             THE COURT:  That's going to happen because that's the

16    nature of the reality and it's the nature of the statistics.

17    Therefore, doesn't -- and it's not just going to be one, going

18    to be a bunch of them.  So doesn't that prove, if what you --

19    that your point that I think you're trying to make isn't true?

20    And that is that not everyone is affected because they're

21    individual.  There are going to be a whole bunch of them whose

22    individual circumstances cannot be explained by discrimination

23    but are going to be explained statistically by the very experts

24    who are going to testify that they can't explain their

25    situation because they're within the realm of statistical

 1    probability that if you roll the dice, black and white, they

 2    would show up in this range.

 3              MR. KLEIN:  Your Honor, I am not a statistician either

 4    and I promise you --

 5              THE COURT:  Yeah, but you're a lot --

 6              MR. KLEIN:  -- as this case goes forward, we're going

 7    to bring in some really smart people who are going to be able

 8    to tell you how the statistics and the basis on which they've

 9    established the disparity, why that applies across the board to

10    black borrowers as a matter of case law and adverse impact.

11              THE COURT:  I would think that's going to be a really

12    difficult thing to do just because it's probably not true.  You

13    know, I mean, you can say that we're all affected by

14    discrimination in some intangible way, but here in the

15    courtroom we're talking about a tangible way.  That is, you

16    know, how much does it cost you?

17         And you know, unless what you say is true, which that is

18    all borrowers absolutely discriminate against all Hispanics and

19    African-Americans, you know, then it won't hold up.  And, you

20    know, knowing what we all know, you know, it's sort of

21    unlikely -- you know, there's a certain -- I would think that's

22    a difficult case, very difficult case because it's -- well,

23    maybe it is true, maybe it is true.  I guess that's why you

24    have to prove it.

25              MR. KLEIN:  We will do our best, Your Honor, and we'll

1    bring in the folks that will walk through the processes and

2    what the processes do and don't explain.

3        And I think your point and your question is certainly

4    valid, but I'm hopeful that when we have the right people in

5    the courtroom we'll be able to explain that to you to your

6    satisfaction.

7            THE COURT:  And so how does the *Coleman* case come into

8    this?  Is this something we'll deal with later?

9            MR. HEFFERON:  Your Honor, I -- we haven't talked

10   about what impact the *Coleman* case would have, in terms of when

11   to present or how to present to Your Honor.  I'm sure the

12   *Coleman* case is absolutely going to be front and center on both

13   party's discussions when they discuss class certification.  We

14   have one of several cases that were in this circuit on somewhat

15   similar issues, but we think there are some differences as

16   well.

17       But I brought it up today mostly just to point out, I

18   think, that's why we're heading in the direction on the

19   plaintiff's side where we're headed because I think if you

20   look -- I feel confident from reading *Coleman,* that if you look

21   to try to provide individual remedies to individual people, the

22   Sixth Circuit said you can't do that in the context of a case

23   like this but --

24           THE COURT:  I mean, I would think it would be better

25   in deciding the -- it would be better in trying to decide the

1      class action issue to have the actual data because, otherwise,

2      it's very sort of theoretical.  So that either involves you all

3      sort of agreeing on what the time period is or we decide the

4      issue of the continuing violation, and so we define what the

5      discovery is going to be.

6          I assume at some point that you wouldn't -- or maybe you

7      would.  I mean, let's say, again, just hypothetically, if we

8      were to decide that the issue here is a two-year period, 2005

9      to 2007, and therefore, give them all the information that they

10     want basically about that two-year period.  Let them do -- let

11     their experts do with it what they want and we'll see how it

12     all comes out.  Would that be something, you know, within

13     reason that you all would do if that's what we did?

14             MR. MCGARRY:  I think we might continue to have some

15     resistance to that.  I will say that it's substantially more

16     reasonable than what is currently being requested.

17         Also, I mean, I guess the point that Mr. --

18             THE COURT:  What kind of resistance?

19             MR. MCGARRY:  If there were a motion to compel that

20     would ask for that, for instance, there might be an opposition

21     to the motion to compel.

22             THE COURT:  Well, but I mean, on the two-year period.

23     Obviously, that -- you would like that.  But are there

24     particular kinds of information that you couldn't provide or is

25     so difficult that you don't think it would be relevant?

```
1              MR. MCGARRY:  Cutting off the time period actually
2      helps substantially from the burden perspective because the
3      further back in time you go, the more difficult it is to
4      retrieve --
5              THE COURT:  Sure, yeah.
6              MR. MCGARRY:  -- the data or to figure out what data
7      you need to retrieve so that certainly helps.
8          We -- you know, I -- I'm reasonably confident that of the
9      data that is available, that we'd ultimately be able to figure
10     out between us what is a proper --
11             THE COURT:  I mean, presumably, all the data that's in
12     data form would be, you know, relatively easy to get to them
13     and you could probably agree on that.  If there was some other
14     types of stuff that wasn't in a data format, that might become
15     more difficult and probably pretty impossible to deal with
16     but -- right?
17             MR. KLEIN:  I agree.
18             THE COURT:  I mean, what you want is data.
19             MR. KLEIN:  Yes.
20             MR. MCGARRY:  Yeah, I think --
21             THE COURT:  You're not going to try to look at
22     individual loan files to see what comment was made in there or
23     something like that?
24             MR. KLEIN:  Correct.  And we're not asking for --
25             THE COURT:  Yeah.
```

1          MR. KLEIN:  -- class member's names or identifying

2     information.

3          THE COURT:  Right.  I understand that, yeah.

4     Okay.  So I mean -- well, how long are you going to take to

5     figure all this stuff out before you want me to figure it out?

6          MR. MCGARRY:  I suspect, Your Honor, with some --

7          THE COURT:  I don't mean anything I've said -- I mean,

8     I'm -- that doesn't mean the way I'm going to decide anything,

9     okay, because I haven't looked at any of this stuff.  I don't

10    have the benefit of all your wonderful learning on this.  You

11    all are more familiar with these cases than I am.  I'm just

12    sort of asking questions and sometimes I ask the questions by

13    making a statement.  So don't anybody think I've decided this

14    case or how it's going.  You know, I'm just trying to learn

15    more about it.  Hopefully that will help me.

16         MR. KLEIN:  That's fine, Your Honor.

17         MR. MCGARRY:  I would say, Your Honor, that in light

18    of this discussion, I'm -- I imagine that Gary and I could

19    figure out in relatively short order whether we'll be able to

20    get this resolved or not, in which case, you know, one or the

21    other of us can bring a motion and start getting the process

22    going forward.

23         MR. KLEIN:  I agree, Your Honor.

24         THE COURT:  And that would be the continuing violation

25    type motion, I mean, that would set up that issue basically

1    because that's going to determine the discoverability of this

2    stuff.

3              MR. MCGARRY:  I think that would be one of several

4    possible issues that could be in play.

5              THE COURT:  Okay.

6              MR. KLEIN:  I think the upshot of that is we'll either

7    be back with a motion in one way or another or we'll work this

8    out in the very near term.

9              THE COURT:  Okay.

10             MR. KLEIN:  So probably what's best is another status

11   conference, maybe in February or March.

12             THE COURT:  Okay.

13             MR. KLEIN:  Any time it's likely to be warmer here

14   than in Boston.

15             MR. HEFFERON:  That may go all the way in July.

16             MR. HANSON:  We would rather have it done in July.

17             THE COURT:  You guys are going to be hard to get

18   together, but on the other hand, you got two Boston people on

19   either side and -- is there a Phoenix person on the defense

20   side?

21             MR. MCGARRY:  No.

22             THE COURT:  Just Washington.

23             MR. PARRY:  Any time but the first week in May.  You

24   can't get in and out of here.

25             THE COURT:  Well, you'll get them all Derby tickets,

```
1    right?

2           MR. PARRY:  That's it.  At least the folks on this

3    side of the table.

4           THE COURT:  What else do we need to talk about?  What

5    about in terms of answers and things like that, is that all

6    taken care of?

7           MR. MCGARRY:  I think we're all up-to-date.

8           THE COURT:  Okay.  Everything else working okay?

9           MR. KLEIN:  I think so, Your Honor.

10          THE COURT:  Settlement?  We don't need to worry about

11   settlement yet or not?  Have you told them how much you want?

12   Unless you tell them, can't write the check, that's what I've

13   always --

14          MR. KLEIN:  There have been some preliminary

15   discussions, but I don't think they're going to be fruitful at

16   this time.

17          THE COURT:  Okay.  All right.  Anything else we need

18   to talk about?

19          MR. MCGARRY:  I don't think so, Judge.

20          MR. KLEIN:  Not on the plaintiff's side, Your Honor.

21          THE COURT:  Okay.  So when do you want to get together

22   next, in February, would that be --

23          MR. MCGARRY:  That's fine.

24          THE COURT:  I mean, it will take -- even if you decide

25   -- you know, an impasse it will take you till then to brief
```

1    this issue, right?

2           MR. HEFFERON:  I think so.

3           THE COURT:  So we ought to schedule it so if you reach

4    an impasse -- I mean, this is not the kind of discovery issue

5    we can just talk over on the phone and resolve.  It will be a

6    significant issue of some kind or another, right?  So then we

7    ought to do it in February so that if you -- you know, if you

8    don't resolve it by the first part of January, then it can be

9    briefed and ready by the time we meet.  Is that right?

10          MR. KLEIN:  That's fine, Your Honor.  I think there's

11   at least a chance that, at least on the plaintiff's side, we

12   would want an evidentiary hearing to be able to explain the

13   relevance of the data.  I don't know for sure at this point but

14   it's possible.

15          THE COURT:  The relevance of the data before whatever

16   period you can't agree on?

17          MR. KLEIN:  Or if we can't agree on what the data is,

18   we may conclude that we would want to bring a witness to

19   testify about the relevance of the data to the necessary

20   statistical analysis.

21          THE COURT:  Well, I would think that, you know, once

22   we determine the time period, that there's going to be a pretty

23   broad area of relevance.  I mean, unless it's obviously not

24   relevant or it's just -- you know, unless you start getting

25   into individual loan files, which would obviously be incredibly

1    difficult to do.  But in terms of data, I would think I would

2    be fairly lenient in terms of allowing that discovery, just

3    because it's going to be hard to know what's relevant in

4    every -- you know, what their experts are going to want to

5    show.  And we'll leave that to letting the experts use it all

6    and then see how it comes out.

7              MR. KLEIN:  You think that will help us work towards a

8    compromise?

9              THE COURT:  So to me, just sort of looking at it, the

10   more important thing would be the time period or rather the --

11   you know, one factor that I could see limiting possibly would

12   be the time period.  But once you define that, you know, there

13   could be a lot of issues that both sides could use.

14       I mean, all those factors that you are going to claim

15   are -- you know, explain away discrepancies, they're going to

16   want to see all the information on that as well.

17             MR. KLEIN:  That's correct, Your Honor.

18             THE COURT:  So anyway, middle of February, whatever

19   date is available.

20             MR. KLEIN:  Mid to end February, whatever date is

21   available.

22             DEPUTY CLERK:  February 23rd.

23             THE COURT:  Okay.  February 23rd.  What day is that?

24             DEPUTY CLERK:  Do you think a whole day or --

25             THE COURT:  Well, we can -- we can set it at a time

1    and then as we get closer we can see whether there's going to

2    be more time that's going to be necessary.  But I would think

3    if we set it for 1:00 -- is that a good time, give everybody a

4    chance to get in?

5              MR. KLEIN:  2:00 p.m. worked very well because of the

6    flight schedule.

7              THE COURT:  So 2:00 and then we can see --

8              MR. KLEIN:  Is that a school vacation week?  This is

9    the kind of issue that Jim and I can confer about.

10             MR. MCGARRY:  I'm actually going to be out of the

11   country on vacation.  It's actually the Monday following our

12   school vacation week, but I'm on vacation until the Tuesday.

13             MR. KLEIN:  So much for the kid's education.

14             MR. MCGARRY:  A couple of days out of Lynnfield Public

15   Schools can be pretty ugly.

16             THE COURT:  Out of what?

17             MR. MCGARRY:  My public school.

18             DEPUTY CLERK:  The week before?

19             THE COURT:  I think the end of February would be

20   better.

21             DEPUTY CLERK:  That's the -- the 23rd was the last

22   week of February.

23             THE COURT:  It was?

24             DEPUTY CLERK:  What about March 5th?  That's a

25   Thursday.

```
 1              MR. KLEIN:  That's fine, Your Honor.

 2              THE COURT:  We'll set it for 2:00 and see how that

 3    looks.

 4              MR. KLEIN:  Thank you.

 5              MR. MCGARRY:  Thanks, Your Honor.

 6              (Off-the-record discussion.)

 7              MR. FOOTE:  Thank you, Judge.  This is Bob Foote.  I'm

 8    going to hang up.

 9              THE COURT:  Do you have anything to add?

10              MR. FOOTE:  It seems like it's going smoothly.  I'll

11    talk to Andy later today, Judge.

12              THE COURT:  Okay.  Thank you.

13              (End of proceedings.)

14

15                    C E R T I F I C A T E

16         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

17    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19         s/Dena Legg                        January 20, 2009
      Certified Court Reporter No. 20042A157    Date
20    Official Court Reporter

21

22

23

24

25
```